IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

PAICE, LLC, et al.,                    *

    Plaintiffs                    *

    v.                            *        CIVIL NO.  WDQ-12-0499

HYUNDAI MOTOR COMPANY, et al.,         *

    Defendants.                   *

    *    *    *    *    *    *    *    *    *    *    *    *

<u>Memorandum Opinion</u>

Presently pending before the Court is Plaintiffs' motion for sanctions (ECF No. 181).  Briefing is complete.  A hearing on this motion, as well as Defendants' motion to strike (ECF No. 190) and Defendants' motion to compel (ECF No. 184), was held on May 20, 2014.  For the reasons discussed herein, the motion for sanctions is GRANTED in part and DENIED in part.

I.  Background

The present lawsuit is a patent infringement case involving hybrid automotive technology, wherein Plaintiffs have alleged infringement by Defendants of <u>five</u> U.S. patents.[1]  The instant motion, however, concerns Plaintiffs' request for sanctions

---

[1] Specifically, Plaintiffs allege infringement of U.S. Patent Nos. 6,209,672 (" '672 Patent"); 7,104,347 (" '347 Patent"); 7,237,634 (" '634 Patent"); 7,559,388 (" '388 Patent"); and 8,214,097 (" '097 Patent"). (ECF No. 94, ¶16).

1

arising from Defendants' alleged discovery failures.  As such, the Court shall outline the progression of discovery to-date.

## A. Prior Discovery Disputes

The parties filed their initial requests for production of documents on May 21, and 23, 2013.  On July 19, 2013, the Court entered a stipulated confidentiality order governing the case and on July 22, the Court entered an order governing ESI.  (ECF Nos. 64, 66).  Thereafter, the parties held multiple "meet and confer" sessions in an attempt to address concerns regarding the nature and pace of Defendants' production, including the parties' initial discovery conference on August 7, 2013, wherein Defendants indicated that they would begin producing technical documents on a rolling basis.  (ECF No. 73-1, Ex. E).  On August 12, 2013, Defendants served their initial ESI disclosures and informed Plaintiffs that "Defendants located in South Korea may be subject to foreign laws and regulations regarding the production of information."  (ECF No. 73-2, Ex. 4).  On August 23, 2013, Defendants made an initial production of technical documents and also informed Plaintiffs that Defendants were unable to produce the majority of the requested technical documents absent approval from the South Korean Ministry of Trade, Industry, and Energy.  (Id., Ex. 6).  Defendants also filed their application for Ministry approval to produce documents disclosing their hybrid vehicle technology on August

23. (<u>Id.</u>, Ex. 5). The Korean Ministry granted approval on October 16, 2013. (ECF No. 77, 2).

Plaintiffs filed their motion to compel (ECF No. 73) on November 5, 2013. The Court held a telephone conference on November 21, 2013, and ordered Defendants to produce all document responses to Plaintiffs' May 23, 2013 document requests by November 30, 2013, or, otherwise, identify any yet-to-be-produced documents by category and inform Plaintiffs of the expected date of production and the reason for delay. (ECF No. 81, 2-3). The Court further ordered that Plaintiffs should advise the Court of any alleged inadequacies in Defendants' production by December 13, 2013. (<u>Id.</u> at 3). On December 13, 2013, pursuant to the Court's November 21, Order, Plaintiffs so advised the Court of several perceived deficiencies in Defendants' document production. (ECF No. 86). On December 16, 2013, the Court held an additional telephone conference and ordered Defendants to produce any additional financial documents to Plaintiffs by December 31, 2014 and meet and confer with Plaintiffs regarding any outstanding technical documents. (ECF No. 91). It is against this backdrop that Plaintiffs filed their pending motion for sanctions.

## B. Present Discovery Dispute

On April 16, 2014, Plaintiffs filed the present motion for sanctions, alleging further discovery delay and obfuscation by

3

Defendants. (ECF No. 181). Specifically, Plaintiffs contend (1) that Defendants have repeatedly delayed production of relevant materials in order to prejudice Plaintiffs' ability to obtain critical information concerning the claims and defenses in this matter; and (2) that Defendants have failed to produce adequately prepared corporate witnesses to address the Rule 30(b)(6) topics upon which they were designated. (Id. at 6-10). As such, Plaintiffs seek severe sanctions for Defendants discovery deficiencies to-date, including the following:

> That Defendants and their experts be precluded from asserting that the hybrid vehicles are not profitable or any other arguments downplaying the importance of hybrid vehicles to Defendants;
>
> That Defendants must produce all relevant higher-level design, functional specifications and requirements documents showing the architecture, software structure, and/or functionality of the hybrid vehicle control system and in particular those created within the last five years. If Defendants maintain there are no such documents, Defendants and their counsel must certify that (1) they have searched for the same and in particular those created within the last five years; and (2) there are no such technical documents. Although Plaintiffs and their expert witnesses may use or rely on other technical documents, Plaintiffs further request that Defendants and their expert witnesses be precluded from using or relying on technical documents beyond the source code to explain Defendants' hybrid vehicle control system;
>
> That Defendants provide senior, knowledgeable and prepared witnesses for the technical topics and all remaining topics and make them available in Baltimore,

4

> Maryland. Further, that the technical 30(b)(6) depositions be conducted before the undersigned;
>
> That Defendants be required to pay Plaintiffs' attorneys' fees and costs for conducting the depositions of Defendants 30(b)(6) witnesses in California and South Korea and that Plaintiffs be granted an additional 50 hours of deposition time.

(Id. at 49-50).

Despite this Court's November 21 and December 16 Orders and Defendants' representations that their production was complete or nearly complete in December, 2013, Defendants have since made multiple untimely document productions in 2014. Between January 22 and 28, 2014, Defendants produced 2,000 pages of responsive documents, including business plans and marketing studies. (ECF No. 181, 16 n.8). Plaintiffs' Rule 30(b)(6) depositions of Kia Motors America ("KMA") and Hyundai Motors America ("HMA") financial designees, Stephen Kosowski and James Carter, occurred on January 27, and 29, 2014, respectively. Between March 21, 2014 and April 8, 2014, Defendants produced in excess of 5,500 pages of technical and financial documents. (Id. at 19 n.9). Plaintiffs' depositions of Defendants' Korean Rule 30(b)(6) designees were scheduled to occur between March 27, 2014 and April 8, 2014. Notably, many of these documents were produced in Korean and/or were produced after relevant designees were already deposed. For example, Kia Motors Company ("KMC") designee Ji-Hoon Han testified to KMC's hybrid pricing and

marketing strategies (see ECF No. 181, Ex. 7, 58:23--59:7, 56:18-25), yet, one week after Mr. Han's deposition, Defendants produced two documents contradicting Mr. Han's testimony as to these strategies (see id., Exs. 8, 9). Similarly, on April 1, 2014, Defendants produced three detailed market studies dated in 2009, 2011, and 2013, yet, by the time of this production, the HMA, KMA, and KMC designees on marketing topics were already deposed by Plaintiffs. (Id. at 19 n.9). On April 30, 2014, Defendants produced 57 additional documents, many in Korean. (ECF No. 204, 11). Lastly, on May 1, 2014, Defendants produced an additional 1,143 documents, the majority in Korean. (Id.).

Plaintiffs' motion for sanctions further identifies categories of yet-to-be-produced financial/planning and technical documents, either identified during the depositions of Defendants' Rule 30(b)(6) designees, or, otherwise, believed to be outstanding. The outstanding financial/planning documents identified in Plaintiffs' motion are as follows:

Documents identified by Stephen Kosowski:

(1) Excel file that tracks hybrid sales by month and gasoline prices by industry volume (ECF No. 181-3, Ex. 3, 38:1-3).
(2) Organization chart for Overseas Product Marketing Team (id., Ex. 3, 55:8-12).
(3) Document addressing "KMA Hybrid Strategy" (id., Ex. 3, 77:19--79:1).
(4) "Life Cycle Timing" documents, updated every several months, (id., Ex. 3, 181:11-25).
(5) Sales projections/forecasts beyond 2014 (id., Ex. 3, 160:2-24).

6

Documents identified by James Carter:

**(6)** Monthly management reporting documents (ECF No. 181, Ex. 4, 27:2--29:8).

**(7)** Audited financial statements (id., Ex. 4, 29:25--30:3).

**(8)** Budgets from HMA to HMC by model (id., Ex. 4, 30:24—31:10); monthly forecasts (id., Ex. 4, 31:11-25).

**(9)** Income statements by model (id., Ex. 4, 65:10--66:17).

**(10)** Pricing costs, earnings and profits related to hybrid and non-hybrid versions of the Hyundai Sonata (id., Ex. 4, 107:3-16).

Documents identified by Ji-Hoon Han:

**(11)** Profitability review of the Kia Optima (ECF No. 181, Ex. 7, 92:13--94:11).

Documents identified by Sukil Yoon:

**(12)** Profitability review of Kia Optima (ECF No. 181, Ex. 7, 92:13--94:11).

**(13)** HMC and KMC long-range product plans (id., Ex. 13, 52:6--56:23).
These product plans were also identified by Jae-Gyou Chung (id., Ex. 14, 33:18-21)).

**(14)** Minutes from Green Car Strategy or Eco-Vehicle Strategy Committee meetings (id., Ex. 13, 36:3--40:23, 48:1--50:17).

Documents identified by Kwang-Young Lee:

**(15)** P/L statements and back-up showing the components of expenses charged to the Hyundai Sonata and Kia Optima and the method for calculating or allocating those expenses (ECF No. 181, Ex. 10, 31:7-13; 52:10-15).

Documents identified by Scott Margason:

**(16)** Data tables reflecting HMA's compliance with U.S. federal fuel economy regulations (ECF No. 181, Ex. 5, 51:15--52:10).

**(17)** Long Range Product Plans reflecting all planned model introductions (<u>id.</u>, Ex. 5, 166:13--167:6).

**(18)** Redacted information from produced business and sales planning documents involving vehicles other than the current Hyundai Sonata hybrid (<u>id.</u>, Ex. 5, 180:3--186:7).

Documents otherwise believed to be outstanding:

**(19)** Bills of Materials ("BOMs") identifying a current list of parts and associated cost information for the Hyundai Sonata and Kia Optima, including parts and costs for parts specific to the Sonata and Optima hybrids.

**(20)** Marketing and planning documents associated with strategy to introduce new hybrid vehicles ███████████ ████████████████████████████████████████.

Documents Identified by John Krafcik:

**(21)** HMA organizational charts with associated employee names (ECF No. 204, Ex. 29, 41:7-18).

**(22)** Reports from Global Design Meetings and Customer Satisfaction Meetings (<u>id.</u>, Ex. 29, 53:21--55:4).

**(23)** New feature literature (<u>Id.</u>, Ex. 29, 56:22-57:21).

**(24)** Monthly sales reports by region (<u>id.</u>, Ex. 29, 133:22--134:11).

**(25)** Monthly financial reports (<u>id.</u>, Ex. 29, 135:24--136:17).

**(26)** Future product presentations (<u>id.</u>, Ex. 29, 142:4-24).

The outstanding technical documents identified by Plaintiffs' motion are as follows:

**(1)** High-level design, functional specifications and requirements documents showing the architecture, software structure, and/or functionality of the hybrid vehicle control system developed since 2008

Documents identifying the architecture, software structure, or functionality of the HCU, including, but not limited to, the HCU in 11MY - 14MY and/or 15MY YF, LF, TF HEV and LF PHEV model that have been or will be sold in the United States, including, but not limited to, HCU Software Structure diagrams, Torque Control

Flow diagrams, or any other documents, drawings,
charts, requirements, specifications, etc.
All internal training materials related to the HCU,
including, but not limited to, the HCU in 11MY-14MY
and/or 15MY YF, LF, TF HEV and LFPHEV models that have
been or will be sold in the United States.

**(2)** "Knowledge Community" and/or any other documents
pertaining to and associated with the HCU of new hybrids

████████████████████████████████████████████████████
████

**(3)** Underlying data associated with internal vehicle testing
and EPA emissions testing, including, <u>inter alia</u>, EPA-
mandated fuel efficiency tests and other tests such as
FTP, Highway, US06, Cold FTP, SC03 testing (ECF No. 181,
Ex. 12 86:23--88:4, 161:22--166:21) and Chassis
dynamometer testing (<u>id.</u>, Ex. 12a, 161:22--166:21).

On May 20, 2014, the Court held a telephone hearing in
order to address the aforementioned yet-to-be-produced
financial/planning and technical documents, as well as address
Defendants' pending motion to strike (ECF No. 190) and motion to
compel (ECF No. 184). On May 21, 2014, the Court issued a
letter order (ECF No. 233) memorializing, <u>inter alia</u>, the
undersigned's instructions to the parties regarding production
of these outstanding financial/planning and technical documents.
As such, the Court ordered Defendants to complete production of
outstanding financial/planning documents, including numbers **1-
12, 14-16, 19,** and **21-25,** and technical documents, including
numbers **1** and **3,** by May 27, 2014. (<u>Id.</u>). Further, because the
parties dispute the scope of discovery in this case as it

9

pertains to Defendants' proposed and/or future vehicles, the Court ordered briefing from the parties in order to ascertain the proper scope of discovery, and thus, determine whether outstanding financial/planning documents, including numbers **13, 17, 18, 20,** and **26,** and technical documents, including number **2,** are discoverable. (Id.). The parties have supplied the ordered briefing. (ECF Nos. 239, 263).

Lastly, Plaintiffs complain that Defendants failed to produce adequately prepared Rule 30(b)(6) Korean designees for several of Plaintiffs' noticed topics and that Defendants' Korean technical topic designee, Dr. Yong-Seok Kim, provided manifestly obstructive and evasive testimony. (ECF No. 181, 40-46). The relevant allegedly inadequate testimony as identified by Plaintiffs' motion for sanctions is as follows:

KMC designee Kwang-Young Lee provided the following testimony in response to questioning regarding KMC Topic 17,[2] for example:

> Q. What department in KMC determines the price for the Hybrid Optima?
> A. I don't know if there is any specific department in that regard.
> Q. Okay. What person then determines the price for the Hybrid Optima?

---

[2] KMC Topic 17 — "pricing, costs, earnings, and profits related to both the hybrid and non-hybrid versions any of Defendants' vehicles, as well as components thereof" (ECF No. 290, Ex. 1).

A.   As I indicated to you earlier, I don't know if there is a specific department, and the same goes for the specific person.

Q.   How is the price set?

A.   It's not really part of my responsibility, so I don't know exactly, but to my understanding, I believe that related departments, such as sales, R&D, and finance, if necessary, these relevant departments would get together and -- to have a meeting or through means of other medium, they would try to come up with reasonable pricing.

Q.   At some point someone from KMC has to communicate to someone from KMA what price is that's going to be charged for the Optima Hybrid, correct?

A.   Yes, yes, I would believe so.

Q.   Do you know who that person is?

A.   I don't.

Q.   Do you know whether there are any documents that are used to communicate the price that KMC is going to charge KMA for the hybrid vehicles that it's selling to KMA?

A.   No, I don't.

Q.   Can you tell me who the person is who makes the final determination for KMC what the price will be that is charged to KMA for hybrid vehicles?

A.   I can't. I don't know because you're talking about the person who makes the final determination correct?

Q.   Yes.

A.   I don't know.

Q.   And you don't know the department that person would be working in, the one who makes the final determination on the price that KMC will charge KMA, is that correct?

A.   Correct.

...

Q.   Do you know what kinds of communication KMC has with KMA with regards to financial sales data?

A.   For starters, I or my team would not have any such communications, but if you're talking about other departments, I'm sure that there would be some

11

communications but I don't know what type of communications there are.

(ECF No. 181, Ex. 10, 35:11--38:3, 40:19--41:1).

KMA designee Stephen Kosowski offered the following testimony during deposition:

> Q.   23 reads, "Documents and correspondence to, from, or including Kia referring to or relating to any of the patents-in-suit, Paice, Abell, Dr. Alex Severinsky, Mr. Nathanael Adamson, or any other Paice employee or consultant." Do you see that?
> A.   Yes.
> Q.   What did you do to -- well, are you aware that you were designated to testify on that topic for KMA?
> A.   I -- I'm aware that I am supposed to talk about product for KMA. I cannot talk about -- I don't know about any documents or correspondence as relates to 23.
> Q.   24 says documents and correspondence to, from, or including Kia, referring to or relating to Paice versus Toyota or this litigation. Do you see that?
> A.   I see this?
> Q.   Are you aware that you were designated to testify on behalf of KMA on Topic No. 24?
> A.   I -- I can only comment on product. I don't know about any of this other discussion.
> Q.   ... Are you aware that you were designated to testify on this topic?
> A.   No.
> Q.   Topic No 25 says, "The date(s) when Kia first had notice of each of the patents-in-suit and the methods by which Kia received such notice." Do you see that?
> A.   Yes.
> Q.   Are you aware that you have been designated by KMA to testify on behalf of KMA as to that topic?
> A.   I -- I'm here to talk about product. So I am not aware.

(ECF No. 181, Ex. 3, 145:17--147:4).

Finally, Dr. Yong-Seok Kim, HMC's and KMC's designee for technical Topics 5, 6, 7, 8, 10, and 11, offered the following testimony, on subjects including:

- Defendants' hybrid "powertrain" technology:

Q. And you agree with me that those two vehicles [the Sonata and Optima hybrids] share the same hybrid powertrain technology, correct?
A. So when you were asking me whether those two vehicles share the same hybrid powertrain technology, so what type of components that might be included in the technology which you would be referring to when you ask that question so that I can give you an answer?
Q. Let me just ask -- let me try it this way. Is the powertrain technology for those two vehicles different, in your view?
A. when you say powertrain -- hybrid powertrain in your question, it is not something that is entirely clear to me, so for me to say whether the technology is the same or not, it's rather difficult

(ECF No. 181, Ex. 15, 21:14--22:6).

- The level and/or type of training HMC and/or KMC provides to hybrid vehicle engineers:

Q. What documents does Hyundai use to teach new employees about the software in the HCU?
A. So what new employees and education in terms of what HCU would you be referring to in your question?
...
Q. What documents does Hyundai use to teach new employees about the software in that HCU?
A. And I also asked you what new employees do you -- you would be referring to?
...

13

Q.   What new employees do you provide training to? And we'll talk about those employees.
A.   The reason why I find it difficult for me to give an answer to your question is because training is provided to whom. So when you say to whom, I am not clear as t owhom that you have in -- that you're referring to and what is being provided to those people. So that is not clear either, which is the reason why that I find it difficult to give you and answer.
Q.   It is clear, though, that Hyundai gives training to some employees, right?
A.   I believe that there is some training that is provided to some employees within Hyundai.
Q.   New engineers, right?
A.   When you say new engineers, what do you mean?
Q.   You don't know what engineers are?
A.   I understand the word "engineer" that is put to me in Korean, but my question was what engineers you had in mind.
Q.   I didn't have any in mind.
A.   If you don't have any specific type of engineers in mind, how do I give an answer to your question?
Q.   That's up to you.
A.   What is up to me?
Q.   Does Hyundai give training to new engineers about the HCU software in its hybrid vehicles, yes or no?
A.   So should I just -- must I give you yes or no answer to your question?
Q.   Yes.
A.   So you're talking about some type of training is provided to somebody and -- And in this instance, I don't know who you have in mind because you have not defined that clearly, and the training about what was not clear in the question. That's the reason why that I find it difficult to give an answer.

(Id., Ex. 16, 177:15--181:7).

-   The meaning of technical and other terms appearing within Defendants' own documents, for example:

14

Q.   Let me try it this way. Have you ever seen a torque flow diagram similar to the one seen on page 239? Before Today?

A.   Likewise, I already told you I do not know as to what torque flow is being referred to here, so I don't think I would be able to give you and answer saying I have seen something that is similar to that or not.

Q.   So you don't know one way or another; is that right?

A.   I'm not saying I do not know. What I'm saying is that the question was not clear, which does not lead me to give an answer.

Q.   What's unclear about it?

A.   I do not know what torque you're referring to and what flow -- or how the flow is, so I can't -- I cannot answer.

...

Q.   Got It. Are you aware of any software design description documents for any HCU module other than this one?

A.   So I will point out to you the -- some of the unclear portions of the question before I give you an answer. I'd like to know what you meant by a module in your question, and if you could tell me what you meant by software design description, then I will try to answer you.

Q.   I meant by module whatever you understand the word module to mean on the front page of this document, and I meant software design description as you understand those words on the front of this page.

A.   I didn't mean to suggest to you that I don't know each meaning of these words, such as module, software design description. That's not what I meant to say. But what I'm saying is I don't understand the meaning of module here, and when these words are put together, "software design description,' please provide me an explanation as to what it means so I can answer you is what I'm saying.

...

Q.   Okay. If you were to explain this first table to one of your salesman in the US, what would you say?

15

A.    When you say salesman, what do you mean?

Q.    Somebody who's not an engineer, that's what I mean.

...

Q.    Okay. Turn to page 115, please. And what does this page show?



Q.    Okay. You didn't write this document, is that right?

A.    Actually, I do not know. It does not indicate the author's name. I would not be able to remember all the documents that I prepared.

Q.    So you may or may not have drafted this slide?

A.    I may or, then again, I may not have.

…

Q.    What's your understanding of the table, sir?

A.    So what would be the portions that I would understand in this table; is that the question?

Q.    Yes.

A.    There are some familiar terms that I am aware of, although I do not know what exact meanings these terms were used in this context.

Q.    Okay. Anything else?

A.    Like I said, there are some words that I'm familiar with, although I do not know what the author intended to convey when he used these words.

…



16



Q.   Other than the one that you wrote that we're
looking at?
A.   Oh, I just noticed that there is that reference
that is indicated here. I just thought it was just a
question you were asking me, not really looking at the
reference here. I was not really looking at the
reference here. As I told you earlier, I'm just one of
the authors of this document, and I don't know whether
I was the one who wrote in the sentence here. If I
were to answer your question that you just asked me
earlier, the first question, so my guess as to the
intention of the author when he wrote this, when it
says ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓ ▓▓▓▓▓▓ ▓▓▓▓ ▓▓▓ ▓▓▓▓▓▓▓▓▓ ▓▓ ▓▓ ▓▓▓▓

…
Q.   Do you have an understanding of what powertrain
mode means in that sentence?
A.   Since I did not write this sentence myself, I
don't know what this means.

(Id., Ex. 15, 136:12-18, 135:18--136:11, 136:24--137:9, 139:14--

140:14; Ex. 16, 172:8--173:3, 194:24--195:21, 177:15--181:7l,

222:5-8).

## C. Dispute over Documents Concerning Future and/or Proposed Hybrid Vehicles

In the course of discovery, an issue arose as to the

appropriate scope of discovery on Defendants' long-range and

forward looking plans to introduce hybrid vehicles in the

future.  The Court ordered briefing on the issue and rules on

its discoverability below.  While Plaintiffs did not focus on

Defendants' failure to produce these particular documents, they

17

did complain about failure to receive "information on the planned introduction of new hybrid vehicles," <u>See</u> (ECF NO. 181, 18) and a ruling on discoverability of these "future and/or proposed hybrid vehicles" is necessary.

## II. Discussion

### A. Future and/or Proposed Hybrid Vehicle Discovery

Plaintiffs seek two types of discovery into Defendants' "future" hybrid vehicle fleet: (1) technical documents and source code relating to the LF HEV and LF PHEV hybrids; and (2) "forward-looking" financial and planning documents relating to Defendants' strategy to expand and/or introduce new hybrid vehicles ████████████████████████████ ██ ██ ██ ██ ██ More precisely, Plaintiffs seek outstanding financial/planning documents –– **13, 17, 18, 20,** and **26**, and outstanding technical documents –– **2**, <u>see</u> <u>supra</u> Part I.B. (ECF No. 181). Defendants respond that any sort of discovery into non-commercialized future products (whether financial or technical) exceeds the permissible scope of discovery in this case. (ECF No. 192, 25-27). In order to properly address this dispute and decide the appropriate scope of discovery, the Court sought additional briefing from the parties, which the parties have supplied. (ECF Nos. 239, 263).

18

**(1) Technical Documents**

On April 5, 2014, Plaintiffs deposed Gumjin Park, HMC and KMC Rule 30(b)(6) designee, wherein Mr. Park testified that

████████████████████████████████████████████████

██████ ██████ (ECF No. 181, Ex. 12, 92:5-24). Plaintiffs contend that ███████████████████████████████████████ hybrids constitutes an act of infringement within the meaning of 35 U.S.C. § 271. (ECF No. 263, 8-9). In pertinent part, § 271(a) provides that "except as otherwise provided in this title, whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefore, infringes the patent." (emphasis added). Accordingly, Plaintiffs contend that the LF HEV and LF PHEV are "currently or imminently infringing" the patents-in-suit, and thus, are part of this case. (ECF No. 263, 12). Defendants raise several objections to Plaintiffs' claims that the LF HEV and LF PHEV infringe Plaintiffs' patents, which the Court shall address in turn.

First, Defendants assert that Plaintiffs' second amended complaint and preliminary infringement contentions define the scope of this case to the Hyundai Sonata and Kia Optima Hybrids

---

████████████████████████████████████████████████

(code named YF and TF, respectively). (ECF No. 192, 25). The Court disagrees. Having reviewed Plaintiffs' second amended complaint, it is clear that Plaintiffs' claims of infringement are not limited to the YF and TF hybrids. Rather, Plaintiffs allege that Defendants' "hybrid vehicles" infringe each of the patents-in-suit. For example, Counts I and II allege infringement of the '634 Patent by Defendants' "hybrid vehicles, such as the Hyundai Sonata Hybrid," and "such as the Kia Optima Hybrid." (ECF No. 94, ¶¶ 38, 45). Plaintiffs' remaining counts are drafted consistently. Clearly, Plaintiffs' second amended complaint alleges infringement by "hybrid vehicles," not the YF and TF hybrids, exclusively. As such, Defendants' assertion that the LF HEV and LF PHEV vehicles fall outside the scope of Plaintiffs' second amended complaint is incorrect.

Next, Defendants contend that Plaintiffs' Local Rule 804.1(a) preliminary infringement contentions fail to identify the LF HEV and LF PHEV, and thus, Plaintiffs must seek leave of Court to amend their infringement contentions prior to obtaining discovery regarding those vehicles. (ECF No. 239, 3). Plaintiffs dispute that Local Rule 804.1(a) is meant to confine the bounds of discovery pursuant to Fed. R. Civ. P. 26. (ECF No. 263, 12). Local Rule 804.1(a) requires, inter alia, that thirty (30) days from the date of the Scheduling Order, Plaintiffs must serve on Defendants:

> Separately for each allegedly infringed claim, each
> accused apparatus, product, device, process, method,
> act, or other instrumentality ("Accused
> Instrumentality") of each allegedly infringing party
> of which the party is aware. This identification shall
> be as specific as possible. Each product, device, and
> apparatus shall be identified by name or model number,
> if known. Each method or process shall be identified
> by name, if known, or by any product, device, or
> apparatus which, when used, allegedly results in the
> practice of the claimed method or process;

Local Rule 804.1(a)(ii) (D. Md. 2011) (emphasis added). The

language of the rule itself supports Plaintiff's position. It

does not demand specificity as to products at this early stage

of litigation, but simply requires that party to "be as specific

as possible," and to provide specifics about which the party is

"aware" or is "known" to it. Moreover, the parties have not

directed the Court to any precedent in this District or the

Fourth Circuit interpreting Local Rule 804.1 as it pertains to

discovery relating to products other than those specifically

named in the infringement contentions. The Court has not

located any directly on point. However, Courts in several other

Circuits, including the Federal Circuit, have addressed this

issue in the context of local patent rules requiring disclosure

of preliminary infringement contentions and have held that no

"bright line rule" limits discovery to products expressly

accused in preliminary infringement contentions. See O2 Micro

Int'l Ltd. V. Monolithic Power Sys., Inc., 467 F.3d 1355, 1366

(Fed. Cir. 2006)(reasoning that "[i]f a local patent rule required the final identification of infringement and invalidity contentions to occur at the outset of the case, shortly after the pleadings were filed and well before the end of discovery, it might well conflict with the spirit, if not the letter, of the notice pleading and broad discovery regime created by the Federal Rules"); also, e.g., EPOS Tech. v. Pegasus Tech., 842 F. Supp.2d 31, 33 (D.D.C. 2012); e.g., Honeywell Int'l, Inc. v. Acer Am. Corp., 655 F. Supp.2d 650, 655-56 (E.D. Tex. 2009); e.g., L.G. Elec., Inc. v. Q-lity Computer, Inc., 211 F.R.D. 360 ,368 (N.D. Cal. 2002). As such, these courts have fashioned a rule that discovery relating to products other than those specifically named in infringement contentions is appropriate when: (1) the infringement contentions give notice of a specific theory of infringement; and (2) the products for which a plaintiff seeks discovery operate in a manner reasonably similar to that theory. See EPOS Tech., 842 F. Supp.2d at 33 (D.D.C. 2012); Honeywell Int'l, Inc. v. Acer Am. Corp., 655 F. Supp.2d 650, 655-56 (E.D. Tex. 2009); Dr. Systems, Inc. v. Fujifilm Med. Sys. USA, Inc., No. 06-0417, 2008 WL 1734241, at *3 (S.D. Cal. April 10, 2008). The Court agrees with the rationale underlying this rule, and accordingly, shall apply it here.

On this point, Plaintiffs compare the recent deposition testimony of Myungwon Lee with Plaintiffs' preliminary

infringement contentions, asserting that "the LF HEV and LF PHEV are reasonably similar to the YF HEV such that supplementation of initial infringement contentions is not even necessary." (ECF No. 263, 15-16). In his deposition, Mr. Lee confirmed that

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████ (<u>Id.</u>, Ex. 8, 76:14--77:8). These modes correspond to those identified in Plaintiffs' preliminary infringement contentions. (<u>Id.</u>, Ex. 10, A38). Mr. Lee further confirmed that ███████████████████████████████████████████

██████ ████████████ █████████ ███ ████ █████████ ████████

████████ ██████ █████ █ █████ ████████ █████ █

████████ █████ ██████ ██████ █████ ████

████████████████████████████████ (<u>Id.</u>, Ex. 8, 79:15--80:10; <u>id.</u>, Ex. 10, A9). In light of these similarities, and to the extent Local Rule 804.1(a) operates to control the bounds of discovery, the Court finds that Defendants are on notice of infringement with regard to the LF HEV and LF PHEV vehicles based on the theories of infringement alleged in Plaintiffs' infringement contentions. Therefore, notwithstanding other objections to discovery relating to Defendants' LF HEV and LF PHEV vehicles, Plaintiffs are not precluded by Local Rule 804.1

from obtaining discovery relating to the technical features of the LF HEV and LF PHEV vehicles.[4]

    Second, Defendants contend that the scope of discovery under the federal rules is not so broad as to require discoverability of future non-commercialized products that do not yet exist in their final form, such as the LF HEV and LF PHEV hybrids. (ECF No. 239, 2). Plaintiffs respond that ███ ███████████████████████████████████████████████████ █████████████████████████████████████████████ and therefore, are distinguishable from speculative future products that may exceed the bounds of permissible discovery. (ECF No. 263, 8-9). This issue, whether discovery in a patent case extends to future products or methods that do not yet exist in their final and/or commercialized form, also appears to be one of first impression in this District. As such, the Court looks elsewhere for guidance.

---

[4]Although the Court finds that Local Rule 804.1 does not, itself, preclude discovery into the technical features of Defendants' LF HEV and LF PHEV hybrids, the Court does not likewise endorse Plaintiffs' assertion that "supplementation of initial infringement contentions is not even necessary." See O2 Micro Int'l, 467 F.3d at 1366 ("we see nothing in the Federal Rules that is inconsistent with local rules requiring the early disclosure of infringement and invalidity contentions and requiring amendments to contentions to be filed with diligence. If the parties were not required to amend their contentions promptly after discovering new information, the contentions requirement would be virtually meaningless as a mechanism for shaping the conduct of discovery and trial preparation."). As noted by Defendants, Plaintiffs have neither amended nor sought leave to amend their preliminary infringement contentions pursuant to Local Rule 804.6. (ECF No. 239, 3-4 n.2). Plaintiffs' ongoing obligations under Local Rule 804.1, however, are not before the undersigned on the present motion. This is the province of the trial judge.

In EPOS Tech, the U.S. District Court for the District of Columbia declined to extend the scope of discovery in that case to cover EPOS products still in the development stage. 842 F. Supp.2d at 34. In that case, Pegasus, the counterclaimant, sought discovery regarding "handmade pre-prototype pens" which EPOS displayed at a technology conference in Barcelona, Spain. Id. The Court declined Pegasus' requests, finding (1) "[r]equiring EPOS to produce information about these devices while they are still in development would not advance Pegasus' pending claims because there is not yet any final product that can be evaluated for infringement; the design is still in flux;" and (2) the only allegedly infringing conduct with regard to the devices at issue took place in Spain, thus, beyond the scope of 35 U.S.C. § 271(a). Id. The U.S. District Court for the District of Minnesota reached the same result in Microsoft Corp. v. Multi-Tech Sys., Inc., No. 00-1412, 2001 U.S. Dist. LEXIS 23155 (D. Minn. Dec. 14, 2001). In that case, Multi-Tech sought to compel discovery of documents relating to Microsoft's "voice.net," a product in development designed to replace the accused plug-in used in Microsoft's MSN Messenger to power its voice capabilities. Id. at *27. The court denied Multi-Tech's motion, finding:

> [t]he voice.net team, and potential product, may be a
> continuation of the accused product, but such future
> expansion is irrelevant at this point. Multi-Tech's

25

assertion that Microsoft "may" be infringing on its
Patent is merely supposition, to support a treasure
hunt. Multi-Tech should not be allowed, on this scant
showing, to rifle through Microsoft's files in the
hopes of uncovering potential future lawsuits, which
have yet ripened into a claim, given the fact that
Microsoft may never launch the product in the
marketplace. Thus, as we conclude that the requested
information is irrelevant, we deny Multi-Tech's Motion
to Compel with regard to the voice.net technology.

Id.; see also Fenster Family Patent Holdings, INc. v. Siemens
Med. Solutions USA, Inc., No 04-0038, 2005 WL 2304190, at *6 (D.
Del. 2005)(denying discovery into Siemens' "AXIS project"
designs, holding (1) the request sought discovery regarding a
"yet to be developed product" the design for which "has not been
finalized and it remains in flux," and (2) the AXIS product
appeared to be outside of the ordered scope of discovery,
limiting discovery to "digital x-ray systems"); but see Bigband
Networks, Inc. v. Imagine Commc'n, Inc., No. 07-0351, 2010 WL
2898288, at *1 (D. Del. July 20, 2010)(ordering production of
the source code of Imagine's future products, finding products
which have not yet been released for sale may still be found to
infringe, for example, through "use" within the meaning of 35
U.S.C. § 271(a)).

Here, two of Defendants' employees, Gumjin Park and
Myungwon Lee, testified ███████████████████████████████
████████████████████████████████████████ (ECF No.
181, Ex. 12, 92:5-24); ECF No. 263, Ex. 8, 86:18--87:23).

26

Additionally, Mr. Park further testified ███ ████████ ███

████████████████████████████████████████████████████████

████████████████████████████████████████ (ECF No. 181,

Ex. 12, 95:20--96:17). However, Mr. Myungwon Lee also testified

that ███████████████████████████████████████████████████████

███████ █████ ██████ ████ █████ █████ ██ ███████

███████████████████ (ECF No. 263, Ex. 8, 86:5-10). In

fact, on cross-examination, Mr. Lee further testified that, ███

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████ █████ █████ ████ ████ ██████ ███████ ██████

███████ █████ ████ ████ ██████ ██████ █████ (ECF

No. 276, Ex. C, 98:18--99:24).

    Having reviewed the briefing and considered the evidence
cited therein, Court finds that federal rules permit discovery
relating to Defendants' future non-commercialized products
alleged to have actually undergone an "infringing 'use,'" *i.e.*,
discovery shall be limited to ███████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████ The Court will not grant
Plaintiffs unfettered discovery into Defendants' still-evolving
products which cannot advance Plaintiffs' pending claims or be
evaluated for infringement because the design of those products
remains in flux, in <u>Korea</u>. While it is unclear what damages

27

Plaintiffs could conceivably obtain from ████████████

████████████████████████████████████████████

████████████████████████████████████████████

████ ████ ████ ████ ████ ████ ████ ██████ constitutes

"use" within the meaning of 35 U.S.C. § 271(a) and Plaintiffs

correctly acknowledge that the Federal Circuit does not

recognize a de minimis exception to patent infringement, see,

e.g., Abbott Labs v. Sandoz, Inc., 566 F.3d 1282, 1299 (Fed.

Cir. 2009). Accordingly, by **July 2, 2014** Defendants shall

respond to Plaintiffs' requests for outstanding technical

documents, including number **2**, see supra Part I.B., to the

extent that those requests seek discovery relating to ████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████

### (2) Financial/Planning Documents

Plaintiffs claim entitlement to significantly broader

discovery into Defendants' "forward-looking" financial and

planning documents relating to Defendants' strategy to introduce

new hybrid vehicles ████ ████ ████ ████ ████ ████ ████

████ ██ ██ ████ ████ ████ ████ ██ ████ including outstanding

financial/planning document numbers **13, 17, 18, 20,** and **26**, see

supra Part I.B. (ECF No. 263, 3-5). Plaintiffs assert that

such discovery is relevant to Plaintiffs' reasonable royalty

damages and further contend that, alternatively, Defendants have put the value and importance of Defendants' hybrid business at issue by disparaging the value of hybrid technology, generally. (Id.). Defendants dispute that current business plans and discussions relating to speculative non-accused products bear any relevance to Plaintiffs' purported damage calculations, and further, contend that Defendants' witnesses have testified only to the value of the currently accused hybrid vehicles. (ECF No. 239, 5; ECF No. 276, 2).

Upon a showing of infringement, a patent holder is entitled to "damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer." 35 U.S.C. § 284. Such a "reasonable royalty" derives from a hypothetical negotiation between the patentee and the infringer to have taken place at the time when the infringement began. ResQNet.com, Inc. v. Lansa, Inc., 594 F.3d 860, 869-70 (Fed. Cir. 2010)(citing Unisplay, S.A. v. American Elec. Sign Co., 69 F.3d 512, 517 (Fed. Cir. 1995)). This analysis is guided by the Georgia-Pacific factors, which, inter alia, include consideration of the "extent to which the infringer has made use of the invention; and any evidence probative of the value of that use." Id.; Georgia-Pacific Corp. v. U.S. Plywood Corp., 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970). The aforementioned consideration informs

the court and jury as to "how the parties would have valued the patented feature during the hypothetical negotiation," but, "neither precedent nor economic logic" precludes consideration of "events and facts that occurred thereafter and that could not have been known to or predicted by the hypothesized negotiators." Lucent Tech., Inc. v. Gateway, Inc., 580 F.3d 1301, 1333 (Fed. Cir. 2009)(citation omitted). As such, Plaintiffs contend that "Defendants' continued expansion into the hybrid vehicle market and reliance on hybrid vehicles for competitiveness, brand image, profitability and government compliance are all facts that are relevant to the value of the patented technology and should be considered in determining a reasonable royalty rate." (ECF No. 263, 5). The Court disagrees.

> What this position lacks is the requisite focus on the
> infringed claim[s]. The damages award can't be
> supported by evidence that the infringers also used
> additional, non-infringing features ... The damages
> award ought to be correlated, in some respect, to the
> extent the infringing method [or product] is used [].
> This is so because this is what the parties to the
> hypothetical negotiation would have considered.

Lucent Tech., 580 F.3d at 1334; see also American Standard, Inc. v. Pfizer, Inc., 828 F.2d 734, 742 (Fed. Cir. 1987)(affirming the district court's denial of discovery into a party's sales data, finding that "[o]ne seeking discovery of sales information must show some relationship between the claimed invention and

30

the information sought"). Here, Defendants' current business discussions relating to speculative, un-accused products (or, even more broadly, "brand image, profitability and government compliance" of those vehicles) do not correlate, in <u>any</u> respect, to the use made of the patents-in-suit by Defendants, <u>see</u> 35 U.S.C. § 284. In fact, Plaintiffs admit that they seek financial/planning document discovery pertaining to "a class of future product[s] that will never become part of the infringement case in this litigation because they will never fall subject to one of the categories of infringement that the statute tells us to look at. They will never be made, used, sold or offered for sale within the United States." (ECF No. 243, 26:1-6). Upon a showing of infringement, Plaintiffs' reasonable royalty damages should correlate to the extent that the accused products have made use of the patents-in-suit, not establish a reasonable royalty for yet un-accused products which have not (and admittedly may never) ripened into an infringement claim. Accordingly, the Court finds that the requested financial/planning document discovery ▇▇▇▇▇ ▇▇▇▇▇ ▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ exceeds the scope of the hypothetical negotiation framework, and therefore, is not reasonably calculated to lead to admissible evidence. Notwithstanding the foregoing, however, the Court reaches a different conclusion with regard to Defendants' ▇ ▇ ▇ ▇

███ █████ █████ ██ █ ████ █████ The requested financial/planning document discovery into Defendants' ████████████████████████████ appears reasonably calculated to lead to admissible evidence "probative of the value of that use." Accordingly, by **July 2,** Defendants shall produce the requested financial/planning discovery, including numbers **13, 17, 18, 20,** and **26,** see supra Part I.B., relating to ██████ ████ ██ ██ █ ██ ████████ as those vehicles may become part of Plaintiffs' infringement case.

Alternatively, Plaintiffs contend that they are entitled to the requested financial/planning discovery (including all future vehicles) because Defendants' 30(b)(6) witnesses have placed the importance of Defendants' hybrid vehicle business, generally, at issue, by disparaging the economic viability of hybrid technology. (ECF No. 263, 6). Defendants respond that Plaintiffs misrepresent the testimony of Defendants' witnesses, whom have testified only to the value of the currently accused vehicles. (ECF No. 276, 2). Having reviewed the testimony cited by Plaintiffs, the Court agrees with Defendants. Defendants' 30(b)(6) witnesses have not made an issue of Defendants' hybrid vehicle business as a whole. Rather, the testimony cited by Plaintiffs describes the value and/or sales performance of the accused products. Mr. Sukil Yoon testified:



(ECF No. 263, Ex. 1, 97:14-22). Mr. Steven Kosowski testified:



(Id., Ex. 2, 67:18--68:16). Mr. Jinsu Son testified:



(Id., Ex. 3, 58:19--59:1). Finally, Mr. Ji-Hoon Han's testimony, although not referencing the performance of the

accused vehicles, does not disparage "hybrid technology" as Plaintiffs contend:



(Id., Ex. 4, 71:11-24). In the Court's view, Defendants have not made an issue of the general viability of hybrid vehicles or technology. Accordingly, the Court will not drastically expand the scope of discovery based on the aforementioned testimony, to financial/planning documents as to the other future vehicles.

## B. Sanctions

The Court now turns to consider whether discovery sanctions are appropriate for Defendants' discovery conduct to-date.[5] Courts have broad discretion to impose punitive measures on any party who fails to obey a discovery order. Fed. R. Civ. P.

---

[5] A centerpiece of Plaintiffs' motion for sanctions was three of the nine disputed documents, which were the subject of Defendants' motion to strike (ECF No. 190). These were technical documents – remarkable as few technical documents had been produced. Moreover, on their face, some of the documents suggested that they had been in defense counsel's possession for considerable time before their production. Since the Court has granted Defendants' motion to strike, the Court does not consider Defendants' treatment of these documents in discovery as evidence of misconduct. Thus, any mention of the documents subject in Defendants' motion to strike was not considered by the Court in the context of Plaintiffs' motion for sanctions.

37(b)(2)(A); Mut. Fed. Sav. & Loan Ass'n v. Richards & Assocs., 872 F.2d 88, 92 (4th Cir. 1989); 8B Charles Alan Wright, et al., Federal Practice & Procedure § 2289 (3d ed. 2010). It is generally recognized that Rule 37 sanctions are intended to: (1) penalize culpable parties; (2) deter others from engaging in similar conduct; (3) compensate the court and other parties for expense caused, and (4) compel discovery. Gregory P. Joseph, Sanctions: The Federal Law of Litigation Abuse, § 49 (2013)(citing Carlucci v. Piper Aircraft Corp., 775 F.2d 1440, 1453 (11th Cir. 1985)). As such, Rule 37 sanctions are both punitive and/or remedial, and may be used to discourage bad behavior or make the aggrieved party whole.

Courts in the Fourth Circuit must consider four factors in determining what sanctions to impose: (1) whether the non-complying party acted in bad faith; (2) the amount of prejudice that noncompliance caused the adversary; (3) the need for deterrence of the particular sort of non-compliance; and (4) whether less drastic sanctions would have been effective. Southern States Rack & Fixture, Inc. v. Sherwin-Williams Co., 318 F.3d 592, 597 (4th Cir. 2003); Mutual Fed. Sav., 872 F.2d at 92. The presence or absence of any one of these factors is generally not decisive: "[t]he harshest of sanctions" may be imposed "when ... culpability is minimally present, if there is a considerable showing of prejudice, or, alternatively, the

35

prejudice is minimal but the culpability is great." Victor Stanley, Inc. v. Creative Pipe, Inc., 269 F.R.D. 497, 533 (D. Md. 2010). Ultimately, a court must "make whatever disposition is just in the light of the facts of the particular case." Bethesda Softworks LLC v. Interplay Entm't Corp., No. 09-2357, 2011 WL 1559308, at *2 (D. Md. Apr. 25, 2011)(citations omitted).

Rule 37 provides a nonexclusive range of sanctions. The most severe is dismissal or default judgment. Mutual Fed. Sav., 872 F.2d at 92 (quoting Wilson v. Volkswagen of America, Inc., 561 F.2d 494, 503-04 (4th Cir. 1977)); Hathcock v. Navistar Int'l Transp. Corp., 53 F.3d 36, 40 (4th Cir. 1995). Slightly lower in the spectrum are preclusion orders, recognized as "strong sanctions, although not as drastic as dismissals or defaults."[6] Gregory P. Joseph, Sanctions: The Federal Law of Litigation Abuse, § 49 (2013). Adverse inference or rebuttable presumption instructions are also considered stricter than an award of fees, but more lenient than dismissals or defaults. Courts have accordingly set a high bar for parties seeking penalties beyond fees. Courts in this district generally decline requests for preclusion absent some strong showing of

---

[6] There are two types of preclusion order. Gregory P. Joseph, Sanctions: The Federal Law of Litigation Abuse, § 49 (2013). The first precludes a party from asserting a claim or defense. Id. The second bars the introduction of evidence. Id. Plaintiffs here seek both (ECF No. 181, 49-50).

prejudice.[7]  See Bethesda, 2011 WL 1559308, at *6 (D. Md. Apr. 25, 2011)(preclusion "typically requires some strong evidence of prejudice")(citing Passlogix, Inc. v. F2A Tech., LLC, 708 F. Supp.2d 378, 421 (S.D.N.Y. 2010)) ; Hastings v. OneWest Bank, No. 10-3375, 2013 WL 1502008, at *4 (D. Md. Apr. 11, 2013)(same).

**(1)  Production of Document Discovery**

As outlined supra, Plaintiffs first ask this Court to impose sanctions against Defendants based on Defendants' slow-moving efforts and purported gamesmanship in producing documents and other discovery.  Plaintiffs have accordingly requested the following sanctions:

> Defendants and their experts be precluded from asserting that hybrid vehicles are not profitable or any other arguments downplaying the importance of hybrid vehicles to Defendants; and

> Defendants and their counsel must certify that (1) they have searched for all relevant higher-level design, functional specifications and requirements documents showing the architecture, software structure, and/or functionality of the hybrid vehicle control system and in particular those created within the last five years; and (2) there are no such documents. Further, although Plaintiffs and their expert witnesses may use or rely on

---

[7] Two types of prejudice result from discovery abuses.  The first is procedural prejudice resulting from delay.  Evasiveness, delay and obfuscation may hinder the opposing party's ability to develop their case. Bethesda Softworks LLC v. Interplay Entm't Corp., No. 09-2357, 2011 WL 1559308, at *5 (D. Md. Apr. 25, 2011)("Indefinite delay, disruption of deadlines, and the continuation of discovery can amount to prejudice."). The second is substantive.  If a party refuses to produce requested evidence despite a court order, their opponent is obviously hindered in their ability to present evidence at trial.

other technical documents, Plaintiffs further request that
Defendants and their expert witnesses be precluded from
using or relying on technical documents beyond the source
code to explain Defendants' hybrid vehicle control system.

(ECF No. 181, 49-50). The above requested sanctions are severe,
including preclusion orders on evidentiary issues.

First, having reviewed the motions, the Court does not find
evidence of conduct rising to the level of bad faith (factor 1).
The Court agrees that Defendants and/or defense counsel have
delayed or have been remarkably ineffective in executing their
discovery obligations. For example, Defendants did not apply
for Korean Ministry approval to export technical discovery
documents until late August, 2013 (three months after receiving
Plaintiffs' May, 2013 requests for production of documents and
one month after the Court entered the confidentiality order in
this case). Moreover, this scenario could certainly have been
anticipated on Defendants' receipt of the lawsuit, which was
filed in February. For another example, Jae-Gyou Chung, HMC's
deputy general manager for export planning, was not asked to
gather responsive documents until February/March, 2014 (likely
after the close of the original fact discovery deadline) (ECF
No. 181, Ex. 14, 96:14--98:7). These examples demonstrate a
self-serving, lackadaisical approach of the Defendants to their
discovery obligations to the opposing parties. The Court
recognizes the complexity of defense in this case given the

38

great geographical distance between outside counsel, and the client, cultural and language differences, the layers of contact between outside counsel, in house counsel and company officials and employees, the apparent different location of Defendants' key technical employee from even in house counsel etc.. That, however, is Defendants' challenge, and does not excuse non-compliance with their obligations under the federal rules. Yet, this self-serving and inadequate discovery behavior does not rise to the very high level of "callous disregard for the authority of the district court and the Rules." See Mutual Fed. Sav., 872 F.2d at 92; Decision Insights, Inc. v. Sentia Group, Inc., 311 Fed. Appx. 586, 599 (4th Cir. 2009).

Second, the need for deterrence is great for the sort of non-compliance exhibited by Defendants (factor 3). Plaintiffs (and this Court) have spent an inordinate amount of time coaxing complete responses to document requests from Defendants. Further, Defendants represented on multiple occasions (to the Court and Plaintiffs) that their production was substantially complete or very near completion in 2013; yet, Defendants have produced thousands of pages of responsive documents in 2014, many productions occurring after Plaintiffs filed the present motion for sanctions. In fact, on November 21, 2013, this Court ordered Defendants to produce all documents responsive to Plaintiffs' May 23, 2013 document requests by November 30, 2013,

or, otherwise identify any yet-to-be produced documents by category and inform Plaintiffs of the expected date of production and the reason for the delay. (ECF No. 81). On December 16, 2013, the Court further ordered Defendants to complete their production of financial documents by December 31, 2013, and meet and confer with Plaintiffs regarding and then-outstanding technical documents. (ECF No. 91). Defendants' numerous 2014 document productions (not to mention the responsive documents alleged as outstanding by the present motion) clearly demonstrate Defendants' noncompliance with this Court's November 21 and December 16 Orders. Moreover, either the gamesmanship or disorganization of counsel in the timing of the production of documents is discovery conduct that demands sanction and deterrence. As discussed earlier, Defendants produced documents, often in Korean, either <u>after</u> relevant depositions, or so close in time to depositions that it was impossible for Plaintiffs' counsel to absorb and incorporate them in their questioning. This type of conduct makes discovery unnecessarily fragmented, stressful and inefficient. Parties are entitled to discovery without the distractions and detriments that such conduct causes.

Next, prior to Plaintiffs' motion for sanctions, the Court had not imposed or warned of any sanctions resulting from Defendants' discovery efforts. Thus, it is unclear whether

sanctions less drastic than the severe sanctions sought by
Plaintiffs would have effectively prevented Defendants' delayed
and untimely productions (factor 4).

Lastly, the most difficult question involves the final
factor, the nature and extent of prejudice that Plaintiffs
suffered and suffer as a result of Defendants' conduct (factor
2). Plaintiffs' motion for sanctions identifies categories of
yet-to-be produced documents either identified during
depositions of Defendants' witnesses or otherwise believed to be
outstanding, see supra Part I.B. - financial/planning documents
numbers **1-26**, technical documents numbers **1-3**. During the May
20, hearing on Plaintiffs' motion for sanctions, the Court and
parties painstakingly separated each category of documents which
remained disputed or required further supplementation. On May
21, 2014, the Court issued a letter Order (ECF No. 233)
memorializing, inter alia, the undersigned's instructions to the
parties regarding production of these outstanding
financial/planning and technical documents. Defendants have
accordingly supplied the ordered supplemental production,
clarification, and/or bates ranges for produced documents. (ECF
No. 244). The parties' joint status report indicates that
Defendants have made five separate document productions since
the May 20, motions hearing (May 20, 27 9:27 a.m., 27 7:29 p.m.,
28, and 29, 2014). (ECF No. 259, 1). ██████████

41



(ECF No. 302) (submitted <u>in</u> <u>camera</u>).

(ECF No. 303). Further, as explained <u>supra</u>, the Court finds that, except for documents related to the requested categories of "forward looking" documents relating to future vehicles (including financial/planning documents **13, 17, 18, 20,** and **26**, and technical documents **2**) exceed the scope of discovery in this case. Thus, at this point, it appears that Plaintiffs have received all outstanding documents identified by their motion for sanctions, which fall within the scope of discovery, and the

42

certification of Defendants and defense counsel that they
requested.

Two types of prejudice result from discovery abuses. The
first is procedural prejudice resulting from delay.
Evasiveness, delay, and obfuscation may hinder the opposing
party's ability to develop their case. Bethesda Softworks LLC
v. Interplay Entm't Corp., 2011 WL 1559308, at *5 ("Indefinite
delay, disruption of deadlines, and the continuation of
discovery can amount to prejudice"). Courts have recognized
that piecemeal, less than complete, and slow production takes a
toll and inflicts a disadvantage on the requesting party.
Aerodyne Systems Engineering, Ltd v. Heritage International
Bank, 115 F.R.D. 281, 288 (D. Md. 1987). Seasoned practitioners
and judges recognize this "death by a thousand cuts" approach to
legitimate discovery requests. It is wearing, counter-
productive, wholly unacceptable and sanctionable. Prejudice
thus is not simply the evidentiary disadvantage that lack of
discovery imposes in proving or defending specific claims. The
Court believes that a sanction can be imposed beyond attorney's
fees even if the requested discovery was largely, ultimately
provided, and the resulting prejudice is therefore predominantly
procedural. See Anderson v. Found. For Advancement, Educ. and
Employment of Am. Indians, 155 F.3d at 503-04 (affirming the
district court's sanction of default judgment, finding that the

43

defendants had "stonewalled discovery from the inception of the lawsuit," and prejudiced the plaintiff through increased expense, annoyance, and delay in prosecuting the case); Daye v. General Motors Corp., 172 F.R.D. 173, 176-78 (M.D.N.C. 1997)(entering the sanction of dismissal with prejudice following the plaintiff's repeated failure provide discovery and meet deadlines); Aerodyne Systems Eng., Ltd v. Heritage Int'l Bank, 115 F.R.D. 281, (D. Md. 1987)(entering the sanction of dismissal with prejudice, finding "[t]here is no doubt that Aerodyne's delinquent and inadequate interrogatories and document responses have resulted in prejudice to Heritage by preventing it from conducting discovery, evaluating the merits of the claims against it, and from adequately preparing its defense in this matter. Furthermore, Heritage has been put to considerable additional time and expense of preparing several motions to compel discovery.")

The second type of prejudice is substantive. If a party refuses to produce requested evidence despite a court order, its opponent is obviously hindered in its ability to prosecute a claim or present evidence at trial. While substantive prejudice to the movant is an important aspect of a Rule 37 analysis, it is generally not required for stronger sanctions, such as preclusion orders. Courts have ordered preclusion, even in the absence of substantive prejudice, in cases where the non-movant

is particularly culpable. The Court of Appeals for the District of Columbia has upheld an order precluding evidence where defendant, "in a remarkable pattern of delay and obfuscation," had "resisted the discovery of specified financial records, computer disks and other information." Jankins v. TDC Management Corp., 21 F.3d 436, 444 (D.C. Cir. 1994). Although the trial was ultimately delayed, minimizing prejudice to plaintiff, the Court found that the order barring defendant from introducing evidence at trial was appropriate given defendants' "willful misconduct, and the purpose of sanctions as a penalty and to deter misconduct by others." Id. Similarly, in Wachtel v. Health Net, Inc., 239 F.R.D. 81, 106 (D.N.J. 2006), the Court excluded 20,000 pages of late-produced documents from trial. While acknowledging that the aggrieved party could potentially remedy any prejudice before the trial date, the Court found that in cases involving a "persistent pattern of delay and obfuscation" a preclusion sanction was proper. Id.

Here, the prejudice to Plaintiffs is largely procedural, rather than substantive. After significant coaxing, Defendants appear to have produced the relevant outstanding discovery. However, Defendants' failures do not amount to "no harm, no foul." Rather, Defendants' piecemeal and tardy productions have been a detriment to Plaintiffs' ability to develop their case. The Court finds no legitimate excuse for the numerous document

45

productions (many documents being produced in Korean) which occurred immediately prior to, during, and after the depositions of Defendants' American and Korean Rule 30(b)(6) designees (including productions on January 22-28, 2014, and March 12, - April 8, 2014). Many (if not all) of these documents were responsive to Plaintiffs' May, 2013 requests for production of documents. One of Defendants' Korean Rule 30(b)(6) designees, Jae-Gyou Chung, was not even asked to gather responsive documents until February/March, 2014. (ECF No. 181, Ex. 14, 96:14--98:7). These tardy productions also hindered Plaintiffs' ability to meaningfully depose Defendants' witnesses during deposition. For example, KMC designee Ji-Hoon Han testified that KMC does not calculate a hybrid price premium (id., Ex. 7, 58:23—59:7), and one-week after Mr. Han's deposition Defendants produced HYUNDAI-KIA00106256 (id., Ex. 8), which identifies KMC's hybrid price premium strategy. On April 1, 2014, Defendants produced three market studies (2009, 2011, and 2013) discussing the importance of features associated with the patents-in-suit. Yet, Plaintiffs had already deposed the marketing topic designees for HMA, KMA, and KMC. Similarly, for example, the single-page spreadsheet summaries produced by Defendants in response to Plaintiffs' requests for discovery regarding pricing, costs, earnings, and profits related to hybrid and non-hybrid versions of accused vehicles

(financial/planning documents number **10**) (ECF No. 204, Exs. 26-28) were clearly inadequate and left Plaintiffs with no means to test Defendants' allocation of costs, margins, and other relevant factors. Plaintiffs should not be forced to resort to motions practice to obtain this sort of relevant discovery. The Court does acknowledge, however, that, except with regard to ███ ███ ███ █ █ █ █ █ ███████ Defendants raised meritorious objections to Plaintiffs requests for discovery pertaining to future vehicles (including outstanding financial/planning documents —— **13, 17, 18, 20,** and **26**, and outstanding technical documents —— **2,** see supra Part I.B.).

Accordingly, the question before the Court is whether, in the absence of significant substantive prejudice, Plaintiffs have met the high bar necessary for the severe and far reaching sanctions they have requested. The Court finds that they have not. Plaintiffs' first sanctions request, a preclusion sanction prohibiting Defendants from asserting that hybrid vehicles are not profitable or downplaying in any way the importance of hybrid vehicles to Defendants, is a drastic remedy. Given that Defendants have now produced sufficient discovery to allow Plaintiffs to challenge Defendants' contentions as to the profitability of the accused vehicles, the Court does not find a sufficient basis for such a far reaching sanction. See Bethesda, 2011 WL 1559308, at *6 (requiring that a requesting

47

party demonstrate a strong showing of prejudice before obtaining a preclusion sanction). Additionally, the Court notes that Defendants' discovery failures pertaining to the profitability of the accused vehicles have predominantly hampered Plaintiffs' ability to meaningfully depose Defendants' financial topic 30(b)(6) designees. Accordingly, the Court will consider whether these tardy productions warrant sanctions in that context (including fees and supplemental depositions), see infra Part II.B.

Plaintiffs' second sanctions request, a preclusion sanction prohibiting Defendants and Defendants' experts from using or relying on technical documents beyond the source code to explain the accused vehicles' HCU, is likewise too drastic a remedy.



Defendants, however, shall not escape without sanction. The Court finds that an award of fees is warranted for

Defendants' misconduct and Plaintiffs' efforts in pursuing the present motion for sanctions, including fees for preparation of the requisite fee petition. See Fed. R. Civ. P. 37(b)(2)(C)(providing the payment of fees as a possible sanction).

### (2) Failure to Prepare Rule 30(b)(6) Designees

Plaintiffs also ask the Court sanction Defendants based on their inadequate preparation of several Rule 30(b)(6) designees and on the evasive and obstructive testimony of Dr. Yong-Seok Kim, one of Defendants' 30(b)(6) technical topic designees. (ECF No. 181, 41-46). Defendants dispute that any of their Rule 30(b)(6) designees were inadequately prepared, evasive, or obstructive. (ECF No. 192, 36-44). Moreover, Defendants contend that any supposed prejudice claimed by Plaintiffs has been cured by the four additional witnesses offered by Defendants in the United States, including (1) Mr. Sang-Baek Cho, Director of the HMC Overseas Product Marketing Group, (2) Mr. Jong-Han Oh, Part Leader of the HMC/KMC Eco-Vehicle Control System Development Team, (3) Mr. Sang-Joon Lee, Assistant Manager of the IP Legal Team, and (4) Mr. Kun-Suk Yang, Deputy Manager of the KMC Business Analysis Team. (ECF No. 192, 18; ECF No. 294, 2).

A corporation noticed pursuant to Fed. R. Civ. P. 30(b)(6) is compelled to comply and may be ordered to designate witnesses

if it fails to do so. 8A Charles A. Wright, Arthur R. Miller,
et al., <u>Federal Practice & Procedure</u> § 2103, at 453-54 (3d ed.
2010).

> The goal of the Rule 30(b)(6) requirement is to enable
> the responding organization to identify the person who
> is best situated to answer questions about the matter,
> or to make sure that the person selected to testify is
> able to respond regarding the matter. In making the
> selection, the responding entity must designate a
> person or persons "who consent to testify on its
> behalf," and it may "set out the matters on which each
> person designated will testify." Once that designation
> is accomplished the rule says that "[t]he persons
> designated must testify about information known or
> reasonably available to the organization."

<u>Id.</u> Thus, testimony elicited at the Rule 30(b)(6) deposition
"represents the knowledge of the corporation, not of the
individual deponents. <u>U.S. v. Taylor</u>, 166 F.R.D. 356, 361
(M.D.N.C. 1996). The duty to prepare a Rule 30(b)(6) designee
is succinctly described by Magistrate Judge Eliason of the
Middle District of North Carolina in <u>Taylor</u>:

> If persons designated by the corporation do not
> possess personal knowledge of the matters set out in
> the deposition notice, the corporation is obligated to
> prepare the designees so that they may give
> knowledgeable and binding answers for the corporation.
> Thus, the duty to present and prepare a Rule 30(b)(6)
> designee goes beyond matters personally known to that
> designee or to matters on which that designee was
> personally involved.

> Rule 30(b)(6) explicitly requires [the entity] to have
> persons testify on its behalf as to all matters known

50

or reasonably available to it and, therefore, implicitly requires such persons to review all matters known or reasonably available to it in preparation for the Rule 30(b)(6) deposition. This interpretation is necessary in order to make the deposition a meaningful one and to prevent the "sandbagging" of an opponent by conducting a half-hearted inquiry before the deposition but a thorough and vigorous one before the trial.

Id. at 361-62 (citations omitted); see also International Ass'n of Machinists and Aerospace Workers v. Werner, 390 F. Supp.2d 479, 487 (D. Md. 2005)(quoting Taylor, 166 F.R.D. at 361); Paul Revere Life Ins. V. Jafari, 206 F.R.D. 126, 127-28 (D. Md. 2002) (quoting Taylor, 166 F.R.D. at 361-62).

Turning to the issue of sanctions, Rule 37(d) permits courts to impose sanctions against a party if a "person designated under Rule 30(b)(6)...fails, after being served with proper notice, to appear for that person's deposition." "Producing an unprepared witness is tantamount to a failure to appear." Taylor, 166 F.R.D. at 362 (citing Resolution Trust Corp. v. Southern Union, 985 F.2d 196, 197 (5th Cir. 1993)); International Ass'n of Machinists, 390 F. Supp.2d at 489-90 (awarding sanctions pursuant to Rule 37(d) for failure to present a prepared 30(b)(6) witness). Providing evasive, incomplete answers to relevant questioning is similarly tantamount to a failure to appear. See Fed. R. Civ. P. 37(a)(4). Rule 37(d)(3) provides that "[s]anctions may include

51

any of the orders listed in Rule 37(b)(2)(A)(i)-(vi)" and "[i]nstead of or in addition to these sanctions, the court must require the party failing to act, the attorney advising that party, or both to pay the reasonable expenses including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust." Accordingly, the Court finds an award of reasonable expenses including attorney's fees would seem mandatory. See International Ass'n of Machinists, 390 F. Supp.2d at 489.

Having reviewed the Rule 30(b)(6) deposition transcripts cited by Plaintiffs' motion, it is abundantly clear that several of Defendants' designees were either unprepared or evasive and obstructive. First, KMC designee Kwang-Young Lee was clearly unprepared to respond to questioning regarding KMC topic 17 (pricing, costs, earnings, and profits related to both the hybrid and non-hybrid versions any of Defendants' vehicles, as well as components thereof")(ECF No. 290, Ex. 1):

> Q. What department in KMC determines the price for the Hybrid Optima?
> A. I don't know if there is any specific department in that regard.
> Q. Okay. What person then determines the price for the Hybrid Optima?
> A. As I indicated to you earlier, I don't know if there is a specific department, and the same goes for the specific person.
> Q. How is the price set?



```
Q.    Do you know who that person is?
A.    I don't.
Q.    Do you know whether there are any documents that
are used to communicate the price that KMC is going to
charge KMA for the hybrid vehicles that it's selling
to KMA?
A.    No, I don't.
Q.    Can you tell me who the person is who makes the
final determination for KMC what the price will be
that is charged to KMA for hybrid vehicles?
A.    I can't. I don't know because you're talking
about the person who makes the final determination
correct?
Q.    Yes.
A.    I don't know.
Q.    And you don't know the department that person
would be working in, the one who makes the final
determination on the price that KMC will charge KMA,
is that correct?
A.    Correct.
...
Q.    Do you know what kinds of communication KMC has
with KMA with regards to financial sales data?
A.    For starters, I or my team would not have any
such communications, but if you're talking about other
departments, I'm sure that there would be some
communications but I don't know what type of
communications there are.
```

(ECF No. 181, Ex. 10, 35:11--38:3, 40:19--41:1).

Second, KMA designee Stephen Kosowski admitted unpreparedness as to KMA Topics 23, 24, and 25:

> Q. 23 reads, "Documents and correspondence to, from, or including Kia referring to or relating to any of the patents-in-suit, Paice, Abell, Dr. Alex Severinsky, Mr. Nathanael Adamson, or any other Paice employee or consultant." Do you see that?
> A. Yes.
> Q. What did you do to -- well, are you aware that you were designated to testify on that topic for KMA?
> A. I -- I'm aware that I am supposed to talk about product for KMA. I cannot talk about -- I don't know about any documents or correspondence as relates to 23.
> Q. 24 says documents and correspondence to, from, or including Kia, referring to or relating to Paice versus Toyota or this litigation. Do you see that?
> A. I see this?
> Q. Are you aware that you were designated to testify on behalf of KMA on Topic No. 24?
> A. I -- I can only comment on product. I don't know about any of this other discussion.
> Q. ... Are you aware that you were designated to testify on this topic?
> A. No.
> Q. Topic No 25 says, "The date(s) when Kia first had notice of each of the patents-in-suit and the methods by which Kia received such notice." Do you see that?
> A. Yes.
> Q. Are you aware that you have been designated by KMA to testify on behalf of KMA as to that topic?
> A. I -- I'm here to talk about product. So I am not aware.

(ECF No. 181, Ex. 3, 145:17--147:4).

Finally, the testimony of Dr. Yong-Seok Kim, HMC's and KMC's designee for technical topics 5, 6, 7, 8, 10, and 11, is

replete with evasive and obstructive responses to relevant lines of questioning on topics, including:

- Defendants' hybrid "powertrain" technology:

Q. And you agree with me that those two vehicles [the Sonata and Optima hybrids] share the same hybrid powertrain technology, correct?
A. So when you were asking me whether those two vehicles share the same hybrid powertrain technology, so what type of components that might be included in the technology which you would be referring to when you ask that question so that I can give you an answer?
Q. Let me just ask -- let me try it this way. Is the powertrain technology for those two vehicles different, in your view?
A. when you say powertrain -- hybrid powertrain in your question, it is not something that is entirely clear to me, so for me to say whether the technology is the same or not, it's rather difficult

(ECF No. 181, Ex. 15, 21:14--22:6). Notably, Defendants admitted in their answer to Plaintiffs' second amended complaint that the Hyundai Sonata and Kia Optima "share the same hybrid powertrain technology." (ECF No. 97, ¶ 34).

- The level and/or type of training HMC and/or KMC provides to hybrid vehicle engineers:

Q. What documents does Hyundai use to teach new employees about the software in the HCU?
A. So what new employees and education in terms of what HCU would you be referring to in your question?
...
Q. What documents does Hyundai use to teach new employees about the software in that HCU?
A. And I also asked you what new employees do you -- you would be referring to?

55

...
Q.   What new employees do you provide training to?
And we'll talk about those employees.
A.   The reason why I find it difficult for me to give
an answer to your question is because training is
provided to whom. So when you say to whom, I am not
clear as to whom that you have in -- that you're
referring to and what is being provided to those
people. So that is not clear either, which is the
reason why that I find it difficult to give you and
answer.
Q.   It is clear, though, that Hyundai gives training
to some employees, right?
A.   I believe that there is some training that is
provided to some employees within Hyundai.
Q.   New engineers, right?
A.   When you say new engineers, what do you mean?
Q.   You don't know what engineers are?
A.   I understand the word "engineer" that is put to
me in Korean, but my question was what engineers you
had in mind.
Q.   I didn't have any in mind.
A.   If you don't have any specific type of engineers
in mind, how do I give an answer to your question?
Q.   That's up to you.
A.   What is up to me?
Q.   Does Hyundai give training to new engineers about
the HCU software in its hybrid vehicles, yes or no?
A.   So should I just -- must I give you yes or no
answer to your question?
Q.   Yes.
A.   So you're talking about some type of training is
provided to somebody and -- And in this instance, I
don't know who you have in mind because you have not
defined that clearly, and the training about what was
not clear in the question. That's the reason why that
I find it difficult to give an answer.
Q.   Okay. If you were to explain this first table to
one of your salesman in the US, what would you say?
A.   When you say salesman, what do you mean?

56

Q.    Somebody who's not an engineer, that's what I mean.

(Id., Ex. 16, 177:15--181:7 Ex. 15, 136:12-18).

      - The meaning of technical and other terms appearing within Defendants' own documents:

Q.    Let me try it this way. Have you ever seen a torque flow diagram similar to the one seen on page 239? Before Today?
A.    Likewise, I already told you I do not know as to what torque flow is being referred to here, so I don't think I would be able to give you and answer saying I have seen something that is similar to that or not.
Q.    So you don't know one way or another; is that right?
A.    I'm not saying I do not know. What I'm saying is that the question was not clear, which does not lead me to give an answer.
Q.    What's unclear about it?
A.    I do not know what torque you're referring to and what flow -- or how the flow is, so I can't -- I cannot answer.
...
Q.    Got It. Are you aware of any software design description documents for any HCU module other than this one?
A.    So I will point out to you the -- some of the unclear portions of the question before I give you an answer. I'd like to know what you meant by a module in your question, and if you could tell me what you meant by software design description, then I will try to answer you.
Q.    I meant by module whatever you understand the word module to mean on the front page of this document, and I meant software design description as you understand those words on the front of this page.
A.    I didn't mean to suggest to you that I don't know each meaning of these words, such as module, software design description. That's not what I meant to say. But what I'm saying is I don't understand the meaning

57

of module here, and when these words are put together, "software design description,' please provide me an explanation as to what it means so I can answer you is what I'm saying.

...

(Id., Ex. 16, 172:8--173:3, 194:24--195:21, 177:15--181:71).

Although Dr. Kim was deposed as a corporate designee, he repeatedly refused to interpret statements in documents that he did not author himself (or similarly refused to interpret statements where he was uncertain whether he was the author). For example:

Q.  Okay. Turn to page 115, please. And what does this page show?



Q.  Okay. You didn't write this document, is that right?
A.  Actually, I do not know. It does not indicate the author's name. I would not be able to remember all the documents that I prepared.
Q.  So you may or may not have drafted this slide?
A.  I may or, then again, I may not have.
…
Q.  What's your understanding of the table, sir?
A.  So what would be the portions that I would understand in this table; is that the question?
Q.  Yes.
A.  There are some familiar terms that I am aware of, although I do not know what exact meanings these terms were used in this context.

58

Q.  Okay. Anything else?

A.  Like I said, there are some words that I'm familiar with, although I do not know what the author intended to convey when he used these words.

…



Q.  Other than the one that you wrote that we're looking at?

A.  Oh, I just noticed that there is that reference that is indicated here. I just thought it was just a question you were asking me, not really looking at the reference here. I was not really looking at the reference here. As I told you earlier, I'm just one of the authors of this document, and I don't know whether I was the one who wrote in the sentence here. If I were to answer your question that you just asked me earlier, the first question, so my guess as to the intention of the author when he wrote this, 

…

A.  Since I did not write this sentence myself, I don't know what this means.

(Id., Ex. 15, 135:18--136:11, 136:24--137:9, 139:14--140:14; Ex. 16, 222:5-8).

The Court finds that under the federal rules, the above referenced testimony demands sanction. Among the sanctions which may be imposed, monetary sanctions are mandatory under Rule 37(d). See International Ass'n of Machinists, 390 F. Supp.2d at 489. As such, the Court shall award Plaintiffs their reasonable expenses, including attorneys' fees, caused by Defendants' failure to present prepared and/or non-evasive witnesses. The Court shall define the appropriate fee sanction, infra, along with the appropriate sanction resulting from Defendants' untimely production of documents. The more difficult question involves deciding what noticed Rule 30(b)(6) topics require supplementation as a result of Defendants' failure to present prepared and/or non-evasive witnesses.

Following the May 20, 2014 hearing on Plaintiffs' motion for sanctions, and in light of the four additional witnesses offered by Defendants in the United States, the Court ordered the parties to meet and confer regarding what (if any) noticed Rule 30(b)(6) deposition topics require further supplementation as a result of the inadequacies alleged in Plaintiffs' motion for sanctions. (ECF No. 233). If the parties could not agree to supplemental depositions during the meet and confer, the Court further ordered the parties to submit a joint status report identifying, by number, each noticed Rule 30(b)(6) topic for which Plaintiffs seek supplementation. (ECF No. 281). The

60

parties have supplied the ordered status report. (ECF No. 290).
The Court also allowed the parties the opportunity to submit
briefs explaining their respective positions regarding further
supplementation. The parties have done so (ECF Nos. 294, 298).

First, the joint status report indicates that Plaintiffs
seek supplementation of Topics 16 and 17 (for both HMC and KMC).
(ECF No. 290, 1-2). As outlined above, the Court agrees that
Defendants' initial KMC Topic 17 designee, Kwang-Young Lee, was
inadequately prepared or otherwise incapable of providing
sufficient testimony as to KMC Topic 17. Defendants accordingly
designated Mr. Kun-Suk Yang, Deputy Manager of the KMC Business
Analysis Team, for KMC Topic 17 and Mr. Yang was deposed by
Plaintiffs on May 18, 2014. Defendants contend that the
deposition of Mr. Yang cured any inadequacies in Mr. Lee's
testimony. (ECF No. 294, 13). However, Plaintiffs argue that
KMC and HMC Topics 16 and 17 require additional supplementation,
for two reasons. (ECF No. 298, 2-3). First, Plaintiffs contend
that Mr. Yang's testimony is "irreconcilable" with clarification
provided by defense counsel after Mr. Yang's deposition
regarding the manner in which Defendants account for research
and development. (ECF No. 298, 2). Second, Plaintiffs contend
that one week after Mr. Yang's deposition, Defendants finally
produced multiple spreadsheets providing additional detail
regarding Defendants' revenue, costs, and margins associated

61

with the accused hybrid vehicles (financial/planning documents
number **10**), and thus, Defendants must present a witness to
supplement the testimony previously provided on Topics 16 and 17
in light of these late-produced documents. (ECF No. 298, Ex.
6). Defendants dispute that either basis raised by Plaintiffs
are grounds for additional supplementation on Topics 16 and 17.
(ECF No. 294, 13-15).

Having reviewed the briefing from the parties, the Court
agrees that some supplementation is necessary. Plaintiffs are
entitled to a supplemental witness regarding HMC and KMC Topics
16 and 17 in order to answer basic questions concerning the
additional data produced on May 26, 2014 (ECF No. 298, Ex. 6).
The single-page spreadsheet summaries initially produced by
Defendants (and available to Plaintiffs during all relevant
depositions) (ECF No. 204, Exs. 26-28) were clearly inadequate.
The Court has already determined that Defendants' failure,
particularly with regard to production of these p/l statements,
was without substantial justification, and therefore,
sanctionable. In this context, Defendants' incomplete and
inadequate disclosure prevented Plaintiffs from meaningfully
questioning Defendants' witnesses regarding Defendants' revenue,
costs, and margins associated with the accused hybrid vehicles,
which, in the Court's view, is tantamount to failure to present
a 30(b)(6) witness. See Fed. R. Civ. P. 37(a)(4); Taylor, 166

F.R.D. at 362; <u>International Ass'n of Machinists</u>, 390 F. Supp.2d at 489-90.   Accordingly, Defendants shall designate a witness for HMC and KMC topics 16 and 17 for the limited purpose of answering basic questions concerning the data presented in the spreadsheets produced by Defendants on May 26, 2014 (ECF No. 298, Ex. 6) and make that witness available for deposition by **July 8** in the United States.[8]

The Court does not, however, find that the apparent contradiction cited by Plaintiffs provides an additional basis for supplementation.   Mr. Kun-Suk Yang's deposition testimony and the post-deposition clarification provided by defense counsel both reasonably state that research (technology development costs that exist separate from specific projects) and development (project-specific and allocated directly to particular projects, <u>e.g.</u> YF or TF hybrids) costs are accounted for separately.   (ECF NO. 298, Ex. 4, 40:12--43:1; <u>id.</u>, Ex. 5).   Supplementation on this issue is not necessary.

Second, the parties' joint status report indicates that Plaintiffs seek supplementation of technical Topics 6, 7, 8, 10, and 12.   (ECF No. 290, 2).   During the meet and confer, the

---

[8] On Wednesday, June 25, 2014, counsel for the parties informally informed the Court that they reached an agreement wherein Defendants agreed to provide a supplemental witness for deposition on these topics.   The Court appreciates the parties' efforts in this matter, but, shall not amend its ruling as the parties have not formally withdrawn the briefing on this matter (ECF Nos. 294, 298).

parties narrowed the sub-topics to be covered in a supplemental deposition on the following technical sub-topics:

(1) The structure and function of the data maps in the Simulink, the source of the data therein, and how that data is populated into those maps (Topics 6, 7, 8, 10, 12);



(3) Differences between the MY 2011, 2012, 2013, and 2014 Simulink (Topic 10);

(4) Charts and tables as shown in Exhibit 4 of Jong Han Oh's deposition (Topics 6, 7, 8, 10, 12).

(Id.) Plaintiffs' brief in support of further supplementation does not meaningfully address this requested supplementation; rather, Plaintiffs rest entirely on their earlier motions as they pertain to technical testimony (ECF Nos. 181, 204). (ECF No. 298, 4). Defendants, on the other hand, dispute that any of the four sub-topics listed above require further supplementation as requested. (ECF No. 294, 5-13). In particular, Defendants note that in an effort to cure any inadequacies in Dr. Yong-Seok Kim's testimony, Defendants offered Mr. Jong-Han Oh, Part Leader of the HMC/KMC Eco-Vehicle Control System Development Team, for deposition in the United States, and that Plaintiffs received ample testimony from Mr. Oh, who testified for two days on the technical development and operation of the accused vehicles. (Id. at 2). The Court shall address each of the four sub-

topics to determine whether further supplementation is necessary.

First, as to "the structure and function of the data maps in the Simulink, the source of the data therein, and how that data is populated into those maps (Topics 6, 7, 8, 10, 12)," as noted by Defendants, HMC and KMC designee on topics 9, 12, 13, and 30, Mr. Gumjin Park, testified extensively as to the data maps at issue (ECF No. 294, Exs. 1-2, 81:5--88:4, 97:23--99:15, 105:17--115:15, 167:11-172:20, 255:15--279:11, 283:11--296:14). Plaintiffs have not identified any deficiencies in Mr. Park's testimony. Additionally, Mr. Oh also provided additional testimony on how the data maps are used by the overall system (Id., Ex. 6, 394:4--397:9). Accordingly, the Court finds no reason to order Defendants to designate an additional witness on this sub-topic.

Second, as to ███ ████ ██ ███ ██ ██ ██ ███ ███ ██ ███ ████ ██ ██ ███ ██ ██ ████ ████ ██ ███ ██ ██ ██ ████ during Plaintiffs' deposition of Dr. Yong-Seok Kim, Plaintiffs initially sought a "high-Level conceptual description" of the ██ from Dr. Kim. (ECF No. 181, Ex. 16, 212:20--213:10). Dr. Kim provided a general and simple Description of the ████ ████ ██ ██ ██ ██ ██ ███ ██ ██ ██ ██ ███ ██ ███ (Id. 213:12--215:7). It does not appear that

Plaintiffs asked Dr. Kim for any greater detail regarding ████ when Plaintiffs questioned Dr. Kim on the Simulink module itself. (e.g., Id. 305:1-22). Additionally, during Plaintiffs' deposition of Mr. Oh, it appears that Mr. Oh testified extensively ████ ███ ███ ██ █████ ██ █████ (ECF No. 294, Ex. 6, 271:25--397:9). Accordingly, again, the Court does not find a basis, such as evasive or inadequate testimony, for further supplementation.

Third, as to "Differences between the MY 2011, 2012, 2013, and 2014 Simulink (Topic 10)," having reviewed the transcript of Dr. Kim's deposition, it appears that Plaintiffs examined the 11MY, 12MY, 13MY, and 14MY in Simulink with Dr. Kim. (ECF No. 181, Ex. 16, 248:2--262:15). Although Dr. Kim stated that he was most familiar with the 12MY and testified further about the operation of that Simulink model (id., Ex. 16, 265:10--299:4), no testimony indicates that Dr. Kim refused to answer questioning regarding the Simulink models for the other referenced model years. Accordingly, the Court does not find that the deficiencies in Dr. Kim's testimony extend to this sub-topic. Rather, it appears that Plaintiffs chose not to question Dr. Kim extensively on this subject, and the Court will not grant Plaintiffs a second opportunity for that reason alone.

Fourth, as to charts and tables as shown in Exhibit 4 of Jong Han Oh's deposition (Topics 6, 7, 8, 10, 12), Plaintiffs

have not provided the Court with any context for the substance of these charts and tables or referenced any evasive or inadequate testimony regarding these charts and tables (from either Mr. Oh or Dr. Kim). Plaintiffs have rested on their prior motions (ECF Nos. 181, 204) and from those motions the Court cannot determine whether Exhibit 4 to Jong Han Oh's deposition demands further supplementation. Accordingly, the request will be denied.

Lastly, the parties' joint status report indicates that Plaintiffs seek supplementation on "multiple topics" (Topics 4-22) to address "Defendants' development of, and plans for, future vehicles." (ECF No. 290, 3). In accordance with the Court's determination that the majority of Plaintiffs' requests for discovery into future vehicles exceed the scope of discovery in this case, see supra, this request is denied with one limited exception. The Court has reasoned that Plaintiffs are entitled to technical and financial/planning discovery regarding Defendants' ███████████████████████████████████████ █████████, in order to evaluate those vehicles for alleged infringement. Yet, the Court cannot determine, based on the briefing from the parties to-date, the extent to which Plaintiffs have already received discovery (including deposition testimony) regarding these ███ ███ ███ ███ ████ █████████. Accordingly, the Court orders Defendants to designate a 30(b)(6)

67

technical topic witness and financial topic witness by **July 9, 2014** for a deposition in the United States on these limited topics regarding these ███████████████ .

### (3) Attorneys' Fees

As explained <u>supra</u>, the Court deems that an award of attorneys' fees is appropriate, even mandatory, as a sanction for Defendants' discovery misconduct. Thus, the Court awards Plaintiffs their reasonable attorneys' fees and expenses as follows:

(1) The Court grants Plaintiffs an award of reasonable attorneys' fees incurred associated with the present motion for sanctions (ECF No. 181), including attorneys' fees incurred in any fee petition. This award, however, is not to include attorneys' fees incurred as a result of the requested briefing regarding discovery into Defendants' future vehicles (ECF No. 263). The Court will also make a 10% reduction to account for plaintiffs' lack of success on its claim of the improper withholding of the nine disputed documents discussed in the memorandum on the motion to strike.

(2) The Court grants Plaintiffs an award of reasonable attorneys' fees incurred pursuant to: (i) preparing for and conducting the deposition of Mr. Kun Suk Yang (as a supplementary witness for the inadequate testimony of

Kwang-Young Lee regarding KMC Topic 17) and preparing for
and conducting the supplemental deposition as ordered
herein regarding HMC and KMC topics 16 and 17 for the
limited purpose of answering basic questions concerning the
data presented in the spreadsheets produced by Defendants
on May 26, 2014 (ECF No. 298, Ex. 6)); (ii) preparing for
and conducting the deposition(s) necessary to supplement
the inadequate testimony of Stephen Kosowski regarding KMA
Topics 23, 24, and 25; and (iii) preparing for and
conducting the deposition of Mr. Jang-Han Oh as a
consequence of the evasive and obstructive testimony of Dr.
Yong-Seok Kim.

It is impossible for the Court to know the respective roles
of defense counsel and Defendants in the misconduct found. It
is, however, clear that defense counsel played a role in the
discovery failures through the legal arguments and positions
taken. Accordingly, the award shall be against the Defendants
and the lead firm of Quinn, Emanuel, Urquhart and Sullivan LLP,
jointly and severally. The award is due **30 days** after entry of
the order establishing the fee award amount of fees.

Plaintiffs shall submit a petition for attorney's fees,
including hourly rates charged and work performed, for the
Court's review, within five business days of the last remedial
supplemental deposition. Defendants shall file any opposition

to the award within five business days thereafter. Alternatively, the Court is prepared to award Plaintiffs estimated attorneys' fees of $35,000, if that is agreeable to both sides to avoid the tedious and distracting preparation and critique of fee petition matters, and, the additional attorneys' fees liability of Defendants for Plaintiffs' fees in preparation of the fee petition. The parties should advise the Court by **July 2, 2014,** if this proposal is acceptable. Thereafter, the Court shall issue an order accounting for the appropriate fee award.

## III. Conclusion

For the foregoing reasons, Plaintiffs' motion for sanctions (ECF No. 181) is GRANTED in part DENIED in part. A separate order shall issue.


Date: June 27, 2014                                    /s/

                                         Susan K. Gauvey
                                         United States Magistrate Judge